Takehiro HIKITA and Alaska Foods,
Inc., Appellants,

v.

NICHIRO GYOGYO KAISHA, LTD.,
Nichiro Pacific, Ltd., Appellees.

No. S–494.

Supreme Court of Alaska.

Jan. 17, 1986.
Rehearing Denied Feb. 25, 1986.

James D. Rhodes, Hartig, Rhodes, Norman, Mahoney & Edwards, Anchorage, for appellants.

John S. Hedland, James T. Brennan, Hedland, Fleischer & Friedman, Anchorage, for appellees.

## OPINION

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

RABINOWITZ, Chief Justice.

This appeal stems from the same events and presents the same issues that this court concerned itself with in *Norman v. Nichiro Gyogyo Kaisha, Ltd.*, 645 P.2d 191 (Alaska 1982). The primary question is whether appellant Alaska Foods, Inc. (Alaska Foods) can maintain an individual shareholder action, as distinguished from a corporate or derivative action, against the appellee Nichiro Gyogyo Kaisha, Ltd. (NGK).[1] The superior court granted NGK's motion for summary judgment, concluding that our decision in *Norman* precluded the bringing of an individual suit. We overrule part of *Norman* and hold that Alaska Foods' action should not have been dismissed.

1. Appellee Nichiro Pacific, Ltd. is affiliated with NGK and thus for purposes of this appeal the two are treated as a single entity.

2. This is an appeal from a grant of summary judgment, and thus the facts are viewed in the light most favorable to appellants. *Wickwire v. McFadden,* 576 P.2d 986 (Alaska 1978). For a more complete presentation of the facts, see this court's decision in *Norman.*

## I. FACTS.[2]

In 1972 Isaac Norman entered into a five-year, $1000 per year lease with the U.S. Navy for some property on Finger Bay at Adak, Alaska. Norman intended to establish a land-based fish processing facility. To carry out his intentions, he formed Adak Aleutian Processors, Inc. (AAP), an Alaskan corporation, and transferred to it the Finger Bay lease.

Norman sold 30% of the AAP stock to Alaska Foods, 30% to NGK, and 10% to Market Place. Alaska Foods, a Washington corporation, was controlled by Alaska Shokai, a Japanese corporation. Appellant Takehiro Hikita and his family owned more than 90% of Alaska Shokai. NGK is a Japanese corporation and Market Place is a Hawaiian corporation. The three corporations, all of whom were engaged in various aspects of the fishing industry, agreed to pay Norman $200,000 jointly and severally for the stock purchased.[3]

At the time of the stock purchase the parties also entered into a "shareholders agreement" which set out the general plan of operation and administration of AAP. The shareholders collectively agreed to "exert their best efforts to achieve the corporate and business purposes of AAP." In addition, each of the shareholders, with the exception of Norman, incurred various specific obligations pursuant to the agreement. NGK agreed to furnish to AAP sufficient funds for the construction and installation of new improvements, equipment and facilities for the Adak operations, upon terms and conditions to be agreed upon between NGK and AAP; to provide to AAP up to $2 million in working capital; and to provide technical assistance for the construction and operation of the processing facilities.

3. Norman retained 20% of the stock. The remaining 10% was previously transferred as a "finders fee" to Otani, vice-president, treasurer and manager of Market Place. Otani had arranged the initial meeting between Norman and Hikita.

Alaska Foods also agreed to furnish funds sufficient for the construction of the necessary facilities, upon terms to be agreed upon between Alaska Foods and AAP. It further agreed to provide the necessary personnel to undertake the general affairs and business operations of AAP. In accordance with the first obligation, Alaska Foods advanced approximately $1.6 million to AAP.

Under NGK's supervision, the plant was completed in 1973 at a cost of $3.2 million, which was $2.5 million above the original estimate. Operations began during the 1973–74 fishing season. The plant was not productive for long, however, as several days into the 1974–75 season NGK suddenly and without notice withdrew from the venture. The facility never reopened.

Alaska Foods asserted that NGK mismanaged and abandoned AAP and thus violated its agreement to "exert its best efforts" to turn the corporation into a successful venture. Alaska Foods sought to recover approximately $10 million, which it claimed resulted from NGK's breach of the shareholders agreement. The superior court granted NGK's motion for summary judgment, concluding that Alaska Foods "does not have the right to pursue any of the alleged contract actions on its own. It may do so only in a derivative action brought on behalf of Adak Aleutian Processors." The court further found that Alaska Food's claims for breach of the agreement were barred because of prior litigation between AAP and NPL, NGK's affiliate.[4]

## II. AN INDIVIDUAL ACTION IS PROPER IN THIS SITUATION.

 In general, a shareholder has no individual cause of action for injuries to his corporation. The rule is designed to prevent a multiplicity of suits against the wrongdoer. As has been said, "[a]ny other rule would admit of as many suits against the wrongdoer as there were stockholders in the corporation." *Wells v. Dane*, 101 Me. 67, 63 A. 324, 325 (1905). In addition, the rule insures that damages recovered are available for payment to the corporation's creditors,[5] and protects the prerogative of the board of directors to determine how the recovered damages should be utilized.[6] There are two major, often overlapping, exceptions to the general rule: (1) where the shareholder suffered an injury separate and distinct from that suffered by other shareholders, and (2) where there is a special duty, such as a contractual duty, between the alleged wrongdoer and the shareholder. *Norman v. Nichiro Gyogyo Kaisha, Ltd.*, 645 P.2d 191 (Alaska 1982); *Arctic Contractors, Inc. v. State*, 573 P.2d 1385, 1386 (Alaska 1978); *Weiss v. Northwest Acceptance Corp.*, 274 Or. 343, 546 P.2d 1065, 1069 (1976); W. Fletcher, Cyclopedia of the Law of Private Corporations § 5911, at 421 (1984).

In the *Norman* case, Norman sought to recover, among other things, the lost value of the stock he retained. This court first concluded that the "separate and distinct injury" exception did not apply because the lost stock value or "opportunity" was an

---

**4.** Alaska Foods asserted both contract and tort claims. Alaska Foods' contract claims were dismissed for two reasons: First, the superior court held that *Norman v. Nichiro Gyogyo Kaisha, Ltd.*, 645 P.2d 191 (Alaska 1982) barred the contract action. Second, the superior court held that prior litigation between related parties barred the contract action under Restatement (Second) of Judgments § 56 (1980). Alaska Foods also asserted tort claims which were dismissed because of the bar of the two year statute of limitations.

Hikita, individually, asserted both contract and tort claims. Hikita's contract claims were dismissed because he was neither a party to, nor an intended beneficiary of, the shareholders

agreement. Relying upon the *Norman* decision, the superior court dismissed some of Hikita's tort claims. As to others, involving personal injuries, the superior court held that they were not barred by either *Norman* or the Restatement (Second) of Judgments § 56.

**5.** *Martin v. Maldonado*, 572 P.2d 763, 773 n. 34 (Alaska 1977).

**6.** *Commonwealth of Mass. v. Davis*, 140 Tex. 398, 168 S.W.2d 216, 221 (1942), *cert. denied*, 320 U.S. 210, 63 S.Ct. 1447, 87 L.Ed. 1848 (1943), *reh. denied*, 320 U.S. 811, 64 S.Ct. 31, 88 L.Ed. 490 (1943).

injury suffered in common by all the shareholders:

> Each shareholder signed the shareholders agreement in the hopes that AAP would prosper; the corporation represented an opportunity for each shareholder and any benefits would accrue to the shareholder in its capacity as a shareholder.

645 P.2d at 195. We went on to hold that no special duty arose out of the contractual relationship under the shareholders agreement, and thus the second exception to the general rule was also not applicable. In support of this conclusion, the court relied on the fact that NGK's duties under the shareholders agreement were owed primarily to AAP.[7]

We are now of the view that in *Norman* the general rule was misapplied, and thus conclude that it is necessary to overrule a portion of that decision. We now hold that a shareholder can sue for breach of contract to which he is a party, even if he has not suffered an injury separate and distinct from that suffered by other shareholders.

This is the test recognized by the majority of jurisdictions. As Fletcher notes:

> Generally, a stockholder cannot sue in his own name, and in his own behalf, to recover for any loss resulting from depreciation of the value of his stock, as

the result of an injury to the corporation itself.

> . . . . .

> This rule does not apply where the wrongful acts are not only wrongs against the corporation but are also violations by the wrongdoer of a duty arising from contract or otherwise, and owing directly by him to the stockholders.

W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 5913, at 434 (1984).[8] "Unquestionably a stockholder may bring suit in his own name to recover damages from an officer of a corporation for acts which are violations of a duty arising from contract or otherwise and owing directly from the officer to the injured stockholder, though such acts are also violations of duty owing to the corporation." *Waller v. Waller*, 187 Md. 185, 49 A.2d 449, 453 (1946).[9]

A shareholders agreement for the benefit of a corporation does create a duty running to both the corporation and the promisee. Section 305(1) of the Restatement (Second) of Contracts (1981) makes this clear:

> A promise in a contract creates a duty in the promisor to the promisee to perform the promise even though he also has a similar duty to an intended beneficiary.

Thus, we disapprove of the holding in *Norman* that an individual shareholder cannot

---

**7.** In concluding that any benefit derived by Norman under the shareholders agreement would be merely incidental, the court emphasized certain language in that portion of the agreement outlining NGK's obligations:

> *In furtherance of the corporate and business purposes of AAP,* shareholders respectively agree as follows:
> (a) [NGK] agrees to:
> 1. Furnish *to AAP* sufficient and necessary funds for the construction and installation of new improvements . . . .
> 2. Furnish *to AAP* working capital funds required by the Adak operations . . . .
> 3. Furnish technical assistance *to AAP* for the Adak operations . . . .

645 P.2d at 196. (emphasis added by *Norman* court)

Dissenting in *Norman,* Justices Matthews and Rabinowitz argued that the court had erred in concluding that the special duty exception did not apply, given that there was a contractual

relationship between the shareholder and the wrongdoer independent of that which the shareholder derived through his interest in the corporate assets and business. *Id.* at 199.

**8.** In section 5916 of his treatise, Fletcher states:

> A stockholder may sue as an individual on contracts he has made as an individual with corporate officers, other stockholders, or third persons . . . . In such cases the status of stockholder is of no importance, since he sues in his individual capacity.

*See also* §§ 5911, 5921.

**9.** *See also Buschmann v. Professional Men's Ass'n,* 405 F.2d 659, 662 (7th Cir.1969); *Bookout v. Schine Chain Theatres, Inc.,* 253 F.2d 292, 295 (2nd Cir.1958); *Timely Drive-In Cleaning Corp. v. Jacobs,* 21 Misc.2d 1052, 190 N.Y.S.2d 194 (Sup.Ct.1959); *Sutter v. General Petroleum Corp.,* 28 Cal.2d 525, 170 P.2d 898, 900-01 (1946) (en banc).

sue for breach of a shareholders agreement that is intended to benefit the corporation.

■ In this case there exists adequate consideration to support an action for breach of contract.[10] Here we have mutual promises, each being sufficient consideration for the other, in the shareholders agreement itself. Alaska Foods agreed to loan up to $2 million to AAP in part because NGK agreed to support AAP in various ways, and NGK agreed to support AAP in part because Alaska Foods agreed to make the loan. We thus conclude that Alaska Foods, as a promisee, is a proper party to maintain an action against NGK for breach of the shareholders agreement. In the event such a breach is established, Alaska Foods may recover all proximate damages that can be proved with reasonable certainty.[11]

## III. RESTATEMENT OF JUDGMENTS SECTION 56 DOES NOT BAR ALASKA FOODS' ACTION FOR BREACH OF THE SHAREHOLDERS AGREEMENT.

NGK's motion for summary judgment also claimed that, even if Alaska Foods does have an individual right to sue for breach of the shareholders agreement, the suit was barred because of prior unsuccessful litigation between AAP and NGK's affiliate, NPL. More specifically, NGK's motion alleged that collateral estoppel, res judicata, and Restatement (Second) of Judgments § 56 (1980) all had the effect of precluding this lawsuit. The superior court did not rule on the first two theories but concluded that the Restatement (Second) of Judgments § 56 was applicable. Thus the question to be answered is did the trial courts in any of the prior suits by AAP specifically determine that NGK had fully

performed its obligations under the contract?

The prior relevant lawsuits were summarized by this court in the *Norman* opinion:

In June of 1975, NPL brought an action against AAP for re-imbursement of working capital loans. AAP counterclaimed, alleging mismanagement and abandonment. In June, 1976, NPL was awarded summary judgment, subject to AAP's right to pursue its counterclaim. The counterclaim was dismissed in December of 1979.

In July of 1975, AAP filed suit in the federal district court against NGK and its affiliate, NPL, for mismanagement and abandonment. In May, 1976, the action was dismissed by stipulation without findings of any kind.

In August, 1975, the Bank of California brought suit against AAP and NPL to foreclose on promissory notes securing the loans from Alaska Foods to AAP, which Alaska Foods has assigned to the bank. AAP crossclaimed against NPL, again asserting mismanagement and abandonment. NPL also crossclaimed against AAP to foreclose on its loans to AAP. Both the bank and NPL were successful in their claims against AAP; and AAP's cross claim was dismissed for failure of AAP to answer interrogatories.

645 P.2d at 193 n. 4.

■ In none of these suits did any of the trial courts make a specific determination as to whether or not NGK breached its obligation to AAP of performance under the shareholders agreement. Given this fact, we conclude that the superior court erred in ruling that section 56 is applicable to the instant case. More specifically we hold that a promisee is "conclusively precluded" from claiming the promisor failed

---

**10.** The court in *Norman* reached the conclusion it did in part because it thought that Norman had provided inadequate consideration to support an action for breach of contract. Norman did not take on any responsibilities or obligations under the shareholders agreement. The dissent found that sufficient consideration did exist, concluding that the shareholders agree-

ment should be looked at in conjunction with the stock purchase agreement.

**11.** The superior court's dismissal of several of Hikita's tort claims concerning loss of stock value was proper under *Norman*. Since Hikita was not a party to the shareholders agreement, he has no contractual rights as a promisee to enforce.

to perform an obligation only when the court, in the prior litigation, has made a specific determination as to that issue. Section 56 provides in relevant part:

> When a contract between two persons creates an obligation in favor of another person as an intended beneficiary:
>
> . . . . .
>
> (2) A judgment against the third party beneficiary in an action *on the obligation* to him terminates the promisor's obligation to the promisee. (emphasis furnished)

The text of section 56 as well as the comment to the section makes it clear that the section only applies when the prior case establishes, as a matter of contract law, that the promisor satisfied its duty to the beneficiary:

> [A] judgment against the beneficiary in his action against the promisor in effect precludes the promisee. This result follows, not because the promisee is bound by the judgment, but because the promisee's action is based upon the promisor's wrongful *failure to perform an obligation* to the beneficiary. *Since the judgment against the beneficiary has conclusively excluded that contingency,* there is a failure of occurrence of an event necessary to the validity of promisee's cause of action. (emphasis furnished)

Wright and Miller state that judgment against the beneficiary "defeats an action by the promisee, not as a matter of preclusion by judgment but on the ground that as a matter of contract law the promisor has no further obligation to perform." Federal Practice and Procedure § 4460, at 530 (citing § 56).

We do not now decide whether principles of collateral estoppel or res judicata preclude this action. As stated, the superior court did not base its decision on these theories, and as a consequence these possible bases for judgment were not adequately briefed by the parties. Further, the record before us is insufficient to permit resolution of these issues.[12]

## IV. THE TORT CLAIMS OF ALASKA FOODS AND HIKITA WERE PROPERLY DISMISSED.

In addition to the claims for breach of the shareholders agreement, Alaska Foods and Hikita asserted a number of tort claims against NGK. NGK moved for summary judgment as to these claims on the ground that this suit was filed after the two-year limitation period had expired. AS 09.10.070. The superior court granted the motion as to Alaska Foods' tort claims but denied the motion as to certain of Hikita's claims because there was a genuine issue of material fact concerning whether Hikita was mentally competent and thus whether the statute had been tolled.[13]

In making its determination that a genuine issue of material fact remained, the superior court gave "great weight" to an affidavit of Hikita's counsel, Mr. Rhodes, which concluded that "the financial ruin visited upon Mr. Hikita by virtue of the Defendants' acts triggered a severe emotional reaction in Mr. Hikita ... [and] rendered him incompetent to attend to his legal affairs until early in 1977." After the summary judgment motion on this issue was denied, NGK requested from Hikita the production of "[a]ll correspondence, memoranda of conversations, ... or other documentation of any kind or nature constituting, evidencing or referring to communications between James D. Rhodes ... and Takehiro Hikita during the time period commencing March 20, 1975 through January 31, 1977." Hikita refused to comply with the request and the court eventually entered final judgment dismissing the tort claims.

---

12. On remand NGK has the option of rearguing res judicata and collateral estoppel.

13. The general test, in regard to whether a mental condition is of the type that will toll the statute of limitations, is whether a person could know or understand his legal rights sufficiently well to manage his personal affairs. It is not required that there be a formal finding of incompetency by a court. *Adkins v. Nabors Alaska Drilling, Inc.*, 609 P.2d 15, 23 (Alaska 1980).

Hikita contends the discovery request violated the attorney-client privilege. We disagree. Hikita cannot be permitted to put his discussions with counsel in issue, and then deny to the opposing party the evidence which is most probative on the question. *See Lewis v. State,* 565 P.2d 846, 850 n. 4 (Alaska 1977). NGK should have had the opportunity to discover those communications which may exist that would indicate that Hikita was sufficiently competent to run his own legal affairs during the period in question. Thus, we conclude that the superior court did not err in dismissing Hikita's tort claims for failure to make discovery.

AFFIRMED in part, REVERSED in part, and REMANDED for proceedings in accordance with this opinion.